The **ALABAMA GREAT SOUTHERN RAILROAD COMPANY**, Plaintiff,

v.

**CITY OF LAUREL, MISSISSIPPI**, et al., Defendants.

Civ. A. No. 2472.

United States District Court,
S. D. Mississippi,
Hattiesburg Division.

Nov. 15, 1971.

Tally D. Riddell, Quitman, Miss., for plaintiff.

W. M. Deavours, Laurel, Miss., for defendant City of Laurel, Miss.

---

4.   402 U.S. 695, 91 S.Ct. 1763.

OPINION OF THE COURT

DAN M. RUSSELL, Jr., Chief Judge.

Plaintiff, Alabama Great Southern Railroad Company, herein called AGS or railroad, filed this action against the City of Laurel, Mississippi, its mayor and two commissioners, claiming jurisdiction by virtue of 28 U.S.C., Sections 1331, 1332, 2201 and 2202. Plaintiff seeks to enjoin defendants from enforcing two city ordinances requiring the railroad in one ordinance, No. 563–1970, to erect and maintain lights at each grade crossing or intersection of its main lines with the streets of the City, and in the other ordinance, No. 564–1970, to require the railroad to erect and maintain flashing red signal lights and bells at those grade crossings which are used by at least 3000 motor vehicles in any twenty-four hour period or is the location of as many as two motor vehicle-train collisions within any twenty-four month period. Plaintiff additionally seeks a declaratory judgment that said ordinances are unconstitutional and illegal as a deprivation of property without due process of law and an unreasonable burden on interstate commerce. Plaintiff also attacks as unconstitutional Section 3374–152 of the Mississippi Code of 1942 which provides that municipalities shall have the power and authority to regulate the crossing of railways, provide precautions and prescribe rules regulating the same, regulate the running of railroads within the limits of the municipality, prescribe rules relating thereto and govern the speed thereof, and to make any other and further provisions, rules and regulations to prevent accidents at crossings and require railroad companies to erect gates across their tracks at the crossing of streets. However, plaintiff made no serious attack on the statute. It requested no three-judge court, and confined the argument in its brief to the alleged unconstitutionality of the ordinances by placing an unwarranted burden on the railroad in allocating to the railroad all the costs of erection and maintenance of the required lights, signals and bells. Further, plaintiff concedes the applicability of the ruling in City of Gainesville v. Southern Ry. Co., 5 Cir., 423 F.2d 588.

This Court held an immediate hearing on plaintiff's request for a temporary injunction and granted same, primarily on the grounds that the railroad had had no prior notice of the city's adoption of the ordinances and because the Court found that it would be impossible for the railroad to comply with the ordinances within the time allotted, thirty days from adoption. By agreement, this temporary restraining order has remained in effect pending a full hearing on the preliminary and permanent relief requested. Such a hearing has been held and the Court has considered all the testimony and exhibits and argument of counsel.

The two ordinances adopted by the City of Laurel on November 24, 1970 are, in part as follows:

ORDINANCE NO. 563–1970

"WHEREAS, there are numerous railroad-street crossings and intersections in the City which have posed a serious safety problem for the citizens of Laurel; and

WHEREAS, the rail traffic as well as motor vehicular and pedestrian traffic on many of these crossings is heavy and hazardous; and

WHEREAS, the accident rate at these crossings has been high and has resulted in a heavy loss of life and property damage; and

WHEREAS, some of these crossings are poorly illuminated and visibility is restricted; and

WHEREAS, some of these hazardous conditions can and should be eliminated in order to protect the health, welfare and safety of the public; and

WHEREAS, the governing authorities of municipalities have the power and authority to regulate the crossings of railroads and to provide precautions and prescribe rules regulating the same to prevent accidents at crossings and on the tracks of the railroads;

NOW, THEREFORE, BE IT ORDAINED by the Mayor and Board of

Commissioners of the City of Laurel, Mississippi:

SECTION 1. All railroads entering the City of Laurel are required at each grade crossing or intersection of their main lines with the streets of the City to erect and maintain sufficient lights to illuminate said crossing and the street on either side thereof for a distance of fifty feet beyond each of the outermost rails to an extent of not less than .5 horizontal foot candles.

SECTION 2. All lights required by this Ordinance shall be lighted on the same schedule as other street lights of the City of Laurel are lighted or shall be equipped with and controlled by photo electric controls so regulated as to automatically turn on said lights at any time illumination falls to or below 2 vertical foot candles at the crossing.

SECTION 3. Failure to erect and maintain lights as required by Section 1 of this Ordinance, or to light the same as required by Section 2 hereof, shall be a misdemeanor, and each day that such violation continues without a reasonable effort to correct the same shall be a separate offense.

SECTION 4. Any person who operates a train through an intersection required to be equipped but which is not equipped in the manner required by Section 1 hereof and at a time when it is required to be lighted under the provisions of Section 2 hereof shall be guilty of a misdemeanor.

SECTION 5. Any person who operates a train through an intersection equipped in the manner required by this Ordinance and at a time when such equipment is not operating in the manner required by Section 2 hereof shall be guilty of a misdemeanor.

SECTION 6. Violations of this Ordinance shall be punishable by a fine of not more than Three Hundred Dollars ($300.00)."

## ORDINANCE NO. 564–1970

"WHEREAS, there are numerous railroad-street crossings and intersections in the City which constitute a serious safety problem for the citizens of Laurel; and

WHEREAS, the rail traffic, as well as motor vehicular and pedestrian traffic on these crossings is heavy and hazardous; and

WHEREAS, the accident rate at these crossings has been high and resulted in heavy loss of life and property damage; and

WHEREAS, restricted visibility and other physical conditions require that the public be given more adequate warning of the approach and presence of rail traffic on these crossings; and

WHEREAS, the governing authorities of municipalities have the power and authority to regulate the crossings of railroads and to provide precautions and prescribe rules regulating the same to prevent accidents at crossings and on the tracks of railroads;

NOW, THEREFORE, BE IT ORDAINED by the Mayor and Board of Commissioners of the City of Laurel, Mississippi:

SECTION 1. 'Grade Crossing' as used in this Ordinance shall mean any intersection at grade of a railroad with a street of the City which now or at any time hereafter:

(a) Is used by at least 3000 motor vehicles in any twenty-four hour period; or

(b) Is the location of as many as two motor vehicle-train collisions within any twenty-four month period.

SECTION 2. All railroads entering the City are hereby required to erect and maintain at all grade crossings on their main lines flashing red signal lights and bells so equipped as to operate automatically at any time a train is approaching within one thousand feet of such grade crossing and continue to operate until such train has passed through the grade crossing.

SECTION 3. All lights and bells required by this Ordinance shall be in addition to any other signs, lights or warnings required by any other ordinance or statute.

SECTION 4. In the installation of lights and bells required by Section 2 hereof there shall be a separate installation on each side of the city street in order that there will be at least one such installation facing oncoming motor vehicular traffic from each direction. On city streets of four traffic lanes or more divided by a neutral ground or median strip there shall be provided at least two (2) additional installations in the neutral ground or median strip so that there will be at least one (1) additional installation facing oncoming motor vehicular traffic from each direction.

SECTION 5. Failure to erect and maintain lights and bells as required by Section 2 of this Ordinance shall be a misdemeanor and each day that such violation continues without a reasonable effort to correct same shall be a separate offense.

SECTION 6. Any person who operates a train through an intersection required to be equipped but which is not equipped in the manner required by Section 2 hereof shall be guilty of a misdemeanor.

SECTION 7. Any person who operates a train through an intersection equipped in the manner required by this Ordinance at a time when such equipment is not operating in the manner required by Section 2 hereof shall be guilty of a misdemeanor.

SECTION 8. Violations of this Ordinance shall be punishable by a fine of not more than Three Hundred Dollars ($300.00.)"

On the day following their passage, the City Clerk forwarded a copy of each ordinance to one of plaintiff's superintendents. On December 4, 1970, the captain of the traffic department of the city advised the same official, by letter, that the city would enforce compliance with Ordinance No. 563–1970 by requiring the installation of lighting at ten named streets intersecting plaintiff's tracks, namely, 24th St., 18th St., 15th St., Kingston Street, Church Street, Central Avenue, Ash Street, Jefferson Street, Hartford Street, and Harrison Boulevard, and with Ordinance No. 564–1970, by the installation of signal lights and bells at four of these intersections, namely, Harrison Boulevard, Central Avenue, Church Street and Ash Street.

It is undisputed that the ten city streets, named above, do cross plaintiff's tracks within the municipal limits of Laurel. Plaintiff estimated the costs to illuminate these streets in the manner required by the ordinance as follows:

| LOCATION | INSTALLATION COST | | ANNUAL MAINTENANCE COST | |
|---|---|---|---|---|
| | STEEL | WOOD | STEEL | WOOD |
| 24th Street | $ 2,100 | $ 1,300 | $ 84 | $ 60 |
| 18th Street | 2,100 | 1,300 | 84 | 60 |
| 15th Street | 2,100 | 1,300 | 84 | 60 |
| Kingston Street | 2,100 | 1,300 | 84 | 60 |
| Church Street | 3,150 | 1,950 | 126 | 90 |
| Central Avenue | 2,100 | 1,300 | 84 | 60 |
| Ash Street | 2,100 | 1,300 | 84 | 60 |
| Jefferson Street | 2,100 | 1,300 | 84 | 60 |
| Hartford Street | 2,100 | 1,300 | 84 | 60 |
| Harrison Blvd. | 2,100 | 1,300 | 84 | 60 |
| Total | $22,050 | $13,650 | $882 | $630 |

As held in City of Gainesville v. Southern Ry. Co., supra, the sole issue here is whether or not the City's allocation of all costs to the railroad is fair and reasonable.

For each of the four intersections named by the City for which flashing red signal lights and bells are required, plaintiff estimated costs as follows:

| LOCATION | INSTALLATION COST | ANNUAL MAINTENANCE COST |
|---|---|---|
| Church Street | $18,000 | $ 675 |
| Central Avenue | 17,000 | 675 |
| Ash Street | 17,000 | 675 |
| Harrison Blvd. | 17,500 | 675 |
| Total | $69,500 | $2,700 |

Before applying the elements of reasonableness to the allocation to plaintiff of the costs of installation and maintenance of the signal lights and bells to these four intersections, the Court notes that despite the city's demand for such installations, via the letter from the captain of the city's traffic department, a traffic count, included in plaintiff's answers to defendants' interrogatories admitted into evidence by stipulation, shows that on a count taken in January 1971 only one intersection, that of Central Avenue and the railroad, showed more than 3000 vehicles crossing the intersection in a 24 hour period. It was further stipulated by the parties and agreed that this ordinance, insofar as also defining a grade crossing as one where as many as two motor vehicle-train collisions occurred within any twenty-four month period, would not apply to collisions in the past, but only to future collisions.

The traffic count referred to above reflected traffic counts taken at Harrison Boulevard on three separate 24 hour periods, April 5, 1961, July 9, 1964, and January 4, 1971, showing the number of vehicles, respectively as 2,175, 2,633 and 2,507. At Central Avenue, two counts were taken, July 8, 1964 and January 5, 1971, the number of vehicles being 6,029 and 4,885 respectively. The count as to Church Street on January 6, 1971 and as to Ash Street on January 7, 1971 showed 1,830 and 2,609 vehicles, respectively. Of the two intersections where more than one count was shown, there were less vehicles on the 1971 counts than on the previous counts.

AGS is successor to the New Orleans and Northeastern Railroad Company which began operation through what is now the City of Laurel in 1883 and which railroad and its successors have operated continuously since that date. The City of Laurel was granted a charter in 1888. Plaintiff's tracks run in a northerly and southerly direction through the City, and the ten above named city streets cross the tracks in an easterly and westerly direction.

In 1950 Laurel had a population of 25,038 and Jones County, Mississippi, of which Laurel is the county seat, had a population of 57,235. The 1960 census showed a population in the City of 27,889 and the county a population of 59,542. The 1970 census shows a reduction in both city and county to 23,530 and 55,043, respectively. Train speeds through the City were by a 1968 ordinance reduced to a maximum of 30 miles per hour. All the ten streets crossing the railroad are paved. At each intersection the crossbuck and railroad stop signs required by law are in place and maintained. At most of the crossings there are City stop signs as well. The evidence was conclusive that at a distance of 15 feet from the nearest line of the main tracks on either side visibility is from 1000 feet and up, except at the 15th Street crossing, where vision is restricted by a junk and salvage company, lessee of AGS and which company, during the trial, was given a 60 day notice to vacate.

Between 1950 and 1970, a total of 62 motor vehicle-train collisions have occurred at these ten crossings, more at Harrison Boulevard, Central Avenue, and Church Street than at the others, but only 4 occurring in 1970, none at the crossings just named. Motor vehicle registration in Jones County increased from 7,525 passenger and truck vehicles in 1945 to 24,975 passenger vehicles alone in 1970. Although there was evidence that the City has made little effort to arrest motorists for failure to stop at the crossings, having made only 49 arrests in the last four years, it may be assumed generally that as vehicular growth increases, accidents increase. Over a ten year period, 1960 to 1971, the evidence showed that the number of trains, daily, over AGS tracks has fluctuated but little, the same number of trains, passenger and freight, being twelve during the years 1969 and 1970.

The facts in this case are unlike those involving newly constructed federal and state highways, calling for widened cross-

ings or over-passes and under-passes in connection with railroad tracks, and in which many states have by statutes allocated only a part of the costs to the railroads.

■ Under facts of this case, and as held in City of Gainesville v. Southern Railway Co., supra, and Fifth Circuit, 1971, 447 F.2d 502, this Court finds that it is not unreasonable to allocate all the costs to AGS of the illumination required under Ordinance No. 563–70 at the ten city street crossings. The Court notes in this connection that there was evidence that the local power company would install the necessary lighting at a minimum charge of $3.50 per light where a pole already stands, and $4.50 per month if necessary to install a pole.

■ As to Ordinance No. 564–70, the Court finds that under the definition of "grade crossing" as it appears in the ordinance based on a traffic count, AGS is at the present time obligated to furnish flashing red signals and bells at only one crossing, that of Central Avenue. AGS is given 45 days from the date hereof to make all the installations under both ordinances as required by virtue of this opinion.

■ The Court takes cognizance of the language of both ordinances providing that a violation shall be a misdemeanor punishable by a fine of not more than $300.00, and the failure to erect and maintain illumination, signal lights and bells each day at each crossing where required shall be a separate violation, and the running of each train through each crossing in the absence of such erection and maintenance shall be a violation. Such provisions, if enforced, could very well be confiscatory, and accordingly, the Court, restrains the City and its mayor and commissioners, their agents, servants and employees from prosecution thereunder without first giving due and proper notice to the alleged violator.

An appropriate order or orders may be submitted with costs to be equally borne by both parties.